# GERALD L. SHARGEL

| | LAW OFFICES | |
|---|---|---|
| GERALD L. SHARGEL | | 570 LEXINGTON AVE., 45TH FLOOR |
| ROSS M. KRAMER | | NEW YORK, NEW YORK 10022 |
| EVAN L. LIPTON | | TEL: 212.446.2323 |
| | | FAX: 212.446.2330 |
| | | info@shargellaw.com |

DOC # _____

January 15, 2009



Hon. Douglas F. Eaton
United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re: United States v. Dreier, 08 MAG 2676**

Dear Judge Eaton,

     I write on behalf of defendant Marc Dreier to provide the Court with a notarized copy of "Exhibit B" to Defendant's Memorandum of Law in Support of Bail Pending Trial, as requested by Your Honor's chambers. I am a Notary Public of the State of New York, and I was with Mr. Dreier at the Metropolitan Correctional Center when he signed this Sworn Declaration. I was not able to stamp the Declaration at the time, but I have since done so. A notarized copy is attached to this letter, as requested.

                                      Respectfully submitted,

                                      Ross M. Kramer

*1/15/09 — Please docket and file.*

*Douglas F. Eaton*

## EXHIBIT B

## SWORN DECLARATION OF DEFENDANT MARC S. DREIER

Marc Dreier, being duly sworn, pursuant to Title 28, United States Code, § 1746, declares the following:

1. In a sealed Complaint issued on December 4, 2008, I was charged with one count of securities fraud and one count of wire fraud. I have been incarcerated in the Metropolitan Correctional Center since December 7, 2008.

2. A bail hearing was held on December 11, 2008, before Magistrate Judge Douglas F. Eaton. My release on bail was denied, subject to further consideration based on additional information.

3. I am a U.S. citizen who is 58 years old and have resided my entire life in New York. I have practiced law in New York for the past 33 years. All of my business and professional life has been centered in New York.

4. My entire family – including my two children (ages 19 and 16), my two siblings and my mother – reside in the United States. I am divorced and share custody of my children with my ex-wife. My older child, Spencer, is a college student and had been residing full-time with me in Manhattan for the past six years. My daughter, Jackie, a high school student, has been residing with me approximately 40% of the time and the balance with her mother, who also resides in Manhattan.

5. I have no relatives living abroad. I have no business associates or friends living abroad, with the following few exceptions (paragraphs 6-9):

6. For the last several years, I have worked with Argentine residents Freddy Langsfeld and his wife Patricia Vaga (who is an attorney) in representing investors in Argentine bonds in a class action in federal court in New York. I have also invested with Mr. Langsfeld (approximately $200,000) in a potential biodiesel business in Argentina, which has never been launched. I have visited Argentina only once (more than three years ago) and have infrequent contact with these colleagues.

7. Contrary to the Government's assertion, I have not been to Turkey even once in the past several years (although I previously visited Turkey a few times on vacation). I have no close business associate in Turkey, nor any business associate there at all – only a friend, Erinch Ozada, who lives part-time in Turkey and part-time in New York. In the past I had co-invested with Mr. Ozada in a pleasure boat and in some vacation property – but I had no such investments or any other business with Mr. Ozada as of the time of my arrest.

8. Giovanni Rubboli, approximately 70 years of age, is a financial consultant who lives in Milan. I have done no business with Mr. Rubboli other than (i) representing Rubboli as a

1

client nearly 30 years ago, (ii) borrowing several hundred thousand dollars from Rubboli more than five years ago (for construction in my firm's law offices), which I have partially repaid, and (iii) allowing Rubboli the use of an office in my law office space in New York when Rubboli visits New York, for which I charge him no rent. I have not been to Italy for at least five years, I conduct no business in Italy and I have no property or other assets in Italy.

9. Mona Wardell, my former personal assistant in New York, now lives in Stockholm. I do no business with Ms. Wardell, have never visited her abroad and have been in contact with her only once since February 2007.

10. I have no business associates and no friends in St. Martin, Anguilla, Qatar, the United Arab Emirates, Spain or Canada.

11. In the past year I visited St. Martin only to board a boat that was docked there. At the Receiver's request, I have now consented to the transfer of that boat to Ft. Lauderdale, Florida, where it has been seized by the Receiver.

12. In Anguilla, I have a share in a vacation property under construction (which, under the contract with the developer, cannot be occupied until its completion, now expected in November 2009). I visited Anguilla during the past year (while on vacation in St. Martin) only to see the status of that property.

13. I have travelled to Spain only once in the past year (and only one other time for a brief vacation several years earlier). The trip to Spain this past year was to accompany a law partner to Barcelona to receive an honorary award. I have no business and no associates in Spain.

14. I visited the United Arab Emirates and Qatar for the first and only time this past November, when I met with several businesspeople, at their invitation, to discuss the possibility of opening a law office in the region and sharing investment opportunities. Those talks were in the most preliminary stage. I have no property or other assets in those countries and have no business associates there; I know only the handful of people I met for the first time this past November.

15. I travelled to Canada several times during the past year. Each trip to Canada, except the most recent, was in connection with representing a client in Canada engaged in a proxy fight for a public company. That representation concluded during this past summer, and I have had no contact with this client (whom I first met less than a year ago) since then. The only other occasion I have visited Canada during the past year was on the occasion when I was arrested on December 7, 2008. I have no property or other assets in Canada and, other than as described above, have conducted no business in Canada.

16. I currently have no money and no assets whatsoever, either in the United States or abroad. The Government has frozen all bank and brokerage accounts that I previously controlled. The Government has seized all property that I previously held. My law firm

has been completely dismantled and put into bankruptcy. My license to practice law has been suspended by Order of the First Department.

17. I have no money abroad. I met with the Receiver, as early as December 17, 2008, and have met with him or his representatives several times since. In addition to providing the Receiver with a complete itemization of all funds and assets that I held directly or indirectly as of the time of my arrest, I have explained to the Receiver in great detail exactly what documents in the Receiver's possession show the disposition of all funds obtained from the transactions which are the subject of the Complaint, including, in particular, the bank statements which would disclose whether or not funds were transferred offshore. I gave the Receiver a detailed accounting of the disposition of those funds and answered every question the Receiver had in that regard. The only funds transferred overseas were (i) payments of principal and interest to foreign accounts designated by the hedge funds that had purchased certain of the allegedly fraudulent notes, and (ii) for a few works of art obtained from certain foreign art galleries, which pieces were shipped to New York and have since been confiscated by the Government.

18. Inasmuch as this same escrow account was also used for deposits from law firm clients in the ordinary course of law firm business, the bank statements also show (i) occasional transfers overseas in the ordinary course of business in connection with closings or other transactions for clients of the law firm, at the direction of these clients who had deposited funds into the account; and (ii) occasional transfers in relatively small amounts for foreign patents and trademark registrations for law firm clients.

19. The bank statements for the escrow account also show the domestic disposition of the $380 million allegedly obtained from the transactions which are the subject of the Complaint. Again, I reviewed the account statements with the Receiver and fully identified the disposition of the funds, showing that all the funds were either (i) wired to the accounts of hedge funds at their direction to make principal and interest payments on note purchases; (ii) transferred to other accounts for the law firm or its affiliates to cover millions of dollars in deficits incurred by the firms from operating expenses, capital expenditures, construction costs and security deposits; (iii) invested and, for the most part, lost in the stock market; or (iv) used for my acquisition of real property, artwork and other property, all of which have now been seized by the Government.

20. I have no criminal record. I graduated from Harvard Law School in 1975, attained partnership at two large New York law firms between 1983 and 1995, and founded a firm bearing my name in 1996 (which grew to more than 250 lawyers).

21. On the several occasions during the past several months when I was already out of the country, fully knowing that I was facing the prospect of prosecution, I nevertheless returned to the United States. In fact, I did this four times during the several weeks before my arrest in New York, each time foregoing any opportunity to avoid prosecution.

22. In late October or early November 2008, I was directly confronted with allegations of fraud by the principal of the real estate development company whose notes I am charged

with fraudulently issuing and by a principal of the accounting firm whose audit letters I am charged with falsifying. At that time a lawyer for the accounting firm, Thomas Manisero, told me on the phone (with principals of the real estate firm and accounting firm also on the line) that a representative of a hedge fund identified in the Complaint as Hedge Fund #1 had informed them of an alleged attempt to use false financial statements to sell a bogus note. Mr. Manisero stated that the matter was extremely serious and that the accounting firm was inclined to "turn the matter over to enforcement" if I could not conclusively demonstrate my innocence.

23. A series of phone calls followed over the next several weeks between me and Mr. Manisero, during which I endeavored to give an explanation. Each time, Mr. Manisero stated that he was dissatisfied with the explanation and that I was leaving him no choice but to report to the accounting firm that there was no innocent explanation for my conduct, thereby implicitly renewing Mr. Manisero's threat to report me to law enforcement.

24. Furthermore, in one of these phone calls, Mr. Manisero identified by name Hedge Fund #2 and asked me if I had engaged in any bogus transactions with that firm. I therefore knew perfectly well that this second hedge fund was also reporting to the real estate firm and the accounting firm that I had engaged in an alleged fraud. It was also very clear to me from my own phone calls with representatives of Hedge Fund #2 at about this time that Hedge Fund #2 was highly suspicious of me. On one occasion, a representative of Hedge Fund #2 informed me that he too had contacted the real estate firm directly (which was confirmed to me when I was copied on an email from the hedge fund to the real estate firm), thereby leaving no doubt in my mind that at least two hedge funds had addressed the transactions directly with the real estate firm and the accounting firm.

25. During the several weeks that these calls occurred, when I knew full well that I was facing the prospect of criminal charges, I was in foreign countries no less than four times. Nevertheless, realizing my exposure, I still chose to return to the United States each time. I did so from St. Martin, from the United Arab Emirates, from Qatar and from Canada.

26. I had at least one phone calls with Mr. Manisero while I was in the United Arab Emirates and on my way to Qatar (in late November), and I knew from that phone call that I had failed to persuade Mr. Manisero to drop the matter, yet I still returned to the United States. I also received an email from Mr. Manisero while I was in Canada during the first week of December 2008, which suggested that Mr. Manisero would be bringing the matter to the authorities, but I nevertheless returned to the United States. In fact, I had a private plane waiting for me at the airport in Toronto on December 2, 2008, which could have taken me to any destination, but instead of fleeing, I remained in Toronto to face questions from the Ontario Teachers Pension Fund even after representatives of the Fund told me on the phone they believed I had engaged in impersonation and fraud. Finally, after I was arrested in Toronto, I agreed to return to the United States rather than remain in Toronto or flee from Toronto – even after I knew, from conversations with my attorney, that I would be arrested upon my arrival in New York.

4

I affirm under the penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
January 14, 2009

_____
Marc S. Dreier

Ross M. Kramer
Notary Public State of New York
No. 02KR6187623
Qualified in New York County
Commission Expires May 27, 2012

5